

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-2003

# Bonneville Intl Corp v. Peters

Precedential or Non-Precedential: Precedential

Docket No. 01-3720

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Bonneville Intl Corp v. Peters" (2003). *2003 Decisions*. Paper 163.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 17, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3720

BONNEVILLE INTERNATIONAL CORPORATION; COX
RADIO, INC.; EMMIS COMMUNICATIONS CORPORATION;
ENTERCOM COMMUNICATIONS CORP.; INFINITY
BROADCASTING CORPORATION; SUSQUEHANA RADIO
CORP.; NATIONAL ASSOCIATION OF BROADCASTERS;
CLEAR CHANNEL COMMUNICATIONS, INC.

v.

MARYBETH PETERS, In Her Official Capacity As Register
of Copyrights for The United States Copyright Office At
The Library of Congress

RECORDING INDUSTRY ASSOCIATION OF
AMERICA, INC.,

Intervenor in D.C.

Bonneville International Corporation, Clear Channel
Communications, Inc., Cox Radio, Inc., Emmis
Communications Corporation, Entercom Communications
Corp., Susquehanna Radio Corp., and National
Association of Broadcasters,

Appellants

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 01-cv-00408)
District Judge: Honorable Berle M. Schiller

———————

Argued on December 2, 2002

Before: ROTH, SMITH, and CUDAHY,* *Circuit Judges*

(Opinion filed: October 17, 2003)

### COUNSEL FOR APPELLANTS

Mark A. Jacoby, Esquire
R. Bruce Rich, Esquire (Argued)
Caroline R. Clark, Esquire
Weil, Gotshal & Manges
767 Fifth Avenue
27th Floor
New York, NY 10153

Marguerite S. Walsh, Esquire
Andrew W. Allison, Esquire
Littler, Mendelson Law Office
1601 Cherry Street
Three Parkway, Suite 1400
Philadelphia, PA 19102

### COUNSEL FOR APPELLEES

David O. Carson
General Counsel
Tanya M. Sandros
Senior Attorney
United States Copyright Office
Library of Congress
101 Independence Avenue, S.S.
Washington, DC 20559-6000

———————

* The Honorable Richard D. Cudahy, Circuit Court Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

Scott R. McIntosh (Argued)
Mark B. Stern
Attorney, Appellate Staff

Robert D. McCallum, Jr.
Assistant Attorney General

Patrick L. Meehan
United States Attorney
United States Department of Justice
Civil Division,
601 D. Street, N.W.
Washington, DC 20530

Cary H. Sherman, Esquire
Steven M. Marks, Esquire
Gary R. Greenstein, Esquire
Susan C. Munsat, Esquire
Recording Industry
Association of America, Inc.
1330 Connecticut Ave., N.W.
Washington, DE

Robert A. Garrett, Esquire
Ronald A. Schechter, Esquire
 (Argued)
Jule L. Sigall, Esquire
Ellen Wasilausky, Esquire
Arnold & Porter
555 12th Street, N.W.
Washington, DC 20004

Vincent V. Carissimi, Esquire
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

---

## OPINION OF THE COURT

---

CUDAHY, *Circuit Judge*:

Plaintiffs appeal from a grant of summary judgment. The district court found that the Copyright Office's rulemaking

with respect to the Internet "streaming" of AM/FM radio broadcast programming was entitled to deference. The plaintiffs argue that the exclusion from copyright protection for "nonsubscription broadcast transmissions" of recorded music is unambiguously intended to apply to their simultaneous webcasting of their radio broadcast signal. We conclude that, whether or not the Copyright Office's interpretation of § 114(d)(1)(A) is to be accorded deference under *Chevron U.S.A., Inc. v. National Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"), the Copyright Office's arguments in support of its position are persuasive, *see Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and our own independent interpretation of the statute accords with that of the Copyright Office. We therefore affirm.

## I.

This case deals with copyright protection for sound recordings. The creator of a musical composition has long had a right of exclusive public performance of that musical piece. 17 U.S.C. § 106(4). Therefore, every time you hear the ubiquitous refrain from "Happy Birthday" in a public performance, a subsidiary of AOL/TimeWarner cashes a royalty check.[1] However, the owner of a copyright in a *sound recording* of a musical composition has long had very little copyright protection. Until 1971 there was no copyright protection at all. With the Sound Recording Amendment of 1971, Pub. L. No. 92-140, 85 Stat. 391, a limited copyright in the reproduction of sound recordings was established in an effort to combat recording piracy. However, there was still no right to public performance of that sound recording. Therefore, while playing a compact disc recording of "Happy Birthday" in a concert hall for the

---

1. Happy Birthday, originally penned by two Kentucky kindergarten teachers in the late 19th century, remains a protected and highly profitable copyright in the intellectual property portfolio of AOL/TimeWarner. Purchased by the company in 1988 for an estimated $25 million, it produces revenues estimated at $2 million per year. Under the Copyright Term Extension Act of 1998, Pub. L. No. 105-298, 112 Stat. 2827, for better or for worse, the song will not enter the public domain until at least the year 2030.

paying public would still enrich AOL/TimeWarner, the person or company that owned the copyright *on the CD* recording of the music would earn no remuneration beyond the proceeds from the original sale of the recording. This dichotomy of copyright protection has a significant impact in the radio broadcasting industry. While radio stations routinely pay copyright royalties to songwriters and composers (through associations like the American Society of Composers, Authors, and Publishers and Broadcast Music, Inc. ("ASCAP") and Broadcast Music, Inc. ("BMI"))[2] for the privilege of broadcasting recorded performances of popular music, they do not pay the *recording industry* royalties for that same privilege. Perhaps surprisingly, this state of affairs, until about ten years ago, produced relatively high levels of contentment for all parties. The recording industry and broadcasters existed in a sort of symbiotic relationship wherein the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings.[3] And in return, the broadcasters paid no fees, licensing or otherwise, to the recording industry for the performance of those recordings. The recording industry had repeatedly sought, however, additional copyright protection in the form of a performance copyright. Until 1995, those efforts were rejected by Congress.

The 1990's brought significant technological change. The advance of digital recording technology and the prospect of digital transmission capabilities created the possibility that consumers would soon have access to services whereby they could pay for high quality digital audio transmissions (subscription services) or even pay for specific songs to be

2. Performing rights organizations such as ASCAP and BMI facilitate the licensing and payment of royalties for composition copyrights by centralizing the process for songwriters, composers, lyricists and publishers.

3. We recognize that, in reality, the model is significantly more nuanced than our "symbiosis" reference allows. As merely one example, the possibility that radio broadcasters may be paid to play certain songs ("payola") complicates the characterization considerably. *See, e.g., Clear Channel to Eliminate Ties With Paid Promoters of Music*, N.Y. Times, April 10, 2003, at C3.

played on demand (interactive services).[4] The recording industry was concerned that the traditional balance that had existed with the broadcasters would be disturbed and that new, alternative paths for consumers to purchase recorded music (in ways that cut out the recording industry's products) would erode sales of recorded music. Congress responded to these concerns with the Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 ("DPRA"). The DPRA added to the list of protectable rights a digital audio transmission performance right.

> [T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> * * *
>
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106(6). When creating this new right, however, Congress also created exemptions from it. Of specific application to the present case was the exemption added to 17 U.S.C. § 114(d)(1)(A)(iii) (Supp. I 1995) for a noninteractive, "nonsubscription broadcast transmission."[5]

---

4. At that time, however, the possible role of the still commercially-nascent Internet in the transmission of music was not yet significant enough to be considered.

5. The DPRA's § 114(d) (Supp. I 1995) provided in part:

> (1) Exempt transmissions and retransmissions.— The performance of a sound recording publicly by means of a digital audio transmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of—
>
> (A)(i) a nonsubscription transmission other than a retransmission;
>
> (ii) an initial nonsubscription retransmission made for direct reception by members of the public of a prior or simultaneous incidental transmission that is not made for direct reception by members of the public; or
>
> (iii) a nonsubscription broadcast transmission;

The paradigmatic "nonsubscription broadcast transmission" was a traditional over-the-air radio broadcast. This exemption was founded in Congress's desire not to impose "new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings." H.R. Rep. No. 104-274, at 14 (1995) ("1995 House Report") (App. at A779).[6]

Additionally, the DPRA, in section 3, codified at 17 U.S.C. §§ 114(d)(2) (Supp. I 1995) and 114(f) (Supp. I 1995), created a statutory licensing regime for noninteractive, subscription services.[7] Copyright holders were required to grant licenses to eligible subscription services. In cases where the copyright holder and the transmitter could not agree on the royalty rate for the license, the DPRA outlined an arbitration mechanism for determining a reasonable rate —§ 114(f) authorized the Copyright Office to convene a copyright arbitration royalty panel ("CARP") to arbitrate licensing rates.

But technology continued to advance, and the Internet soon became a viable medium over which to transmit, in real time, sound recordings. This real-time transmission of sound recordings over the Internet is known as "streaming"[8]

---

6. Much of the legislative history relevant to the present case is collected in the appendices to the parties' briefs. When appropriate, the relevant appendix page number will also be cited as "App. at A###."

7. Interactive, on-demand services are subject to an almost unconditional performance right in the copyright holder: the purveyors of such services are required to negotiate individual, discretionary licenses with individual copyright holders subject to certain time limitations for exclusive licenses. *See* § 114(d)(3). The unconditional public digital performance right with respect to interactive digital audio transmissions corresponds to Congress's perception that interactive digital audio services pose the greatest threat to recording sales.

8. The subject matter of the present case, Internet streaming, should not be confused with the use of the Internet to exchange digital copies of entire songs through centralized or distributed peer-to-peer file exchange mechanisms like Napster and KaZaA. The legal issues surrounding file exchange of songs involve the established exclusive right to reproduction of a sound recording. Similarly, technology exists whereby a sound

and "webcasting," and the transmitter of an Internet stream of music is known as a "webcaster." Anyone with a computer, a reasonably speedy connection to the Internet, streaming software and the equipment to copy songs from CDs to a computer in the popular and compressed MP3 format ("rip" the songs) could webcast sound recordings through streaming. Additionally, established radio broadcasters began to webcast simultaneously over the Internet their AM/FM broadcast programming. It is this AM/FM webcasting that is the principal concern in the present case.

Again, the recording industry became concerned that technology would erode recording sales by providing alternative sources of high quality recorded performances. In 1998 Congress responded by amending the DPRA's amendments to the Copyright Act with the Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998) ("DMCA"). The DMCA expanded the class of transmissions available for the statutory licensing regime under the DPRA to include eligible nonsubscription webcasting, and eliminated from § 114(d) two of the nonsubscription, noninteractive exemptions to the digital audio transmission performance right. The exemption for "nonsubscription broadcast transmissions" was, however, left intact and moved to its current location at § 114(d)(1)(A). "The deletion of [the other] two exemptions [wa]s not intended to affect the exemption for nonsubscription broadcast transmissions." H.R. Conf. Rep. No. 105-796, at 80 (1998) ("1998 Conference Report") (App. at A1197).

In March of 2000, the Recording Industry Association of America ("RIAA") petitioned the Copyright Office for a

---

recording performance streamed over the Internet can be "recorded" by a listener, duplicated (infinitely, with no drop-off in the original recording's quality because of the digital medium of the recording) and distributed. Again, however, this issue pertains to the exclusive right of reproduction and not to the interpretation of the digital audio transmission performance right in § 106(6). Our concern is with the right of the copyright holder for the sound recording to limit the public digital audio transmission performance of that sound recording in the first instance.

Rulemaking to clarify whether AM/FM webcasting (the simultaneous Internet streaming by radio broadcasters of their AM/FM broadcast programming) was a "nonsubscription broadcast transmission" that was exempt from the § 106(6) digital audio transmission performance right. After a Notice and Comment procedure, in December of 2000 the Copyright Office promulgated a rule stating that AM/FM webcasting is not an exempt transmission under § 114(d)(1)(A). Public Performance of Sound Recordings: Definition of a Service, Final Rule, 65 Fed. Reg. 77292 (Dec. 11, 2000) ("Streaming Regulation") (App. at A69).

The plaintiffs—the National Association of Broadcasters, along with some of its more prominent members—sued the Register of Copyrights in the present action seeking judicial review of the rulemaking. The RIAA joined the case as an intervenor-defendant. The district court granted summary judgment for the Copyright Office and the RIAA. The district court found the scope of the exemption in § 114(d)(1)(A) to be ambiguous and that the Copyright Office was empowered by Congress to interpret that ambiguity in order to administer the statutory licensing scheme of § 114(f). Therefore, because the Copyright Office's rule was reasonable, the court found that the rulemaking was entitled to deference under *Chevron*, and, hence, the rule was enforced. This appeal followed.

## II.

Our review of the district court's grant of summary judgment is plenary. *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003).

## A.

We have determined that, in this appeal, we do not need to decide whether *Chevron* or *Skidmore* deference should apply to our review of the Copyright Office's interpretation of § 114(d)(1)(A). We come to this conclusion because, whichever standard of deference is accorded, we agree with the Copyright Office.

If we had determined under *United States v. Mead Corp.*, 533 U.S. 218 (2001), that the Copyright Office had been delegated authority by Congress to regulate the scope of the digital audio transmission performance copyright, we would afford *Chevron* deference to the Copyright Office's interpretation of that statute. If, on the other hand, we were to conclude that the Copyright Office had not been authorized by Congress to enact rules with the force of law on the issue whether the exclusion from copyright protection for "nonsubscription broadcast transmissions" applies to simultaneous webcasting of radio broadcast signals, we would, under *Mead*, afford the Copyright Office's interpretation of the statute only *Skidmore* deference. *See Skidmore*, 323 U.S. at 140. Under *Skidmore*, the Copyright Office's determination can be a useful tool for interpreting the statute as an original matter. Because we find that the Copyright Office's interpretation is persuasive even under the less demanding standard of *Skidmore* deference, we need not go on to parse out whether *Chevron* deference should, in fact, be accorded the Copyright Office's regulation here.[9]

---

9. The Supreme Court in *Mead* altered the judicial landscape of *Chevron* deference, limiting previously strong presumptions of deference to formal agency actions and promoting a more searching threshold inquiry into the existence of Congressional authorization. *See MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania*, 271 F.3d 491, 517 (3d Cir. 2001) ("[*Mead*] suggests that not every formal agency act involving interpretation of a federal statute is entitled to deference."). After *Mead*, the existence of a general delegation of authority and the use of a formal notice-and-comment procedure is no longer sufficient to trigger *Chevron* deference—instead we must look for express or implied indications that "Congress ever thought of [giving the agency actions] the deference claimed for them here." *Mead*, 533 U.S. at 231; *see, e.g., Ebbert v. Daimler-Chrysler Corp.*, 319 F.3d 103, 110-11 (3rd Cir. 2003) (finding that general delegation of authority to EEOC to "carry out the provisions of [Title 42]" did not impliedly authorize EEOC to interpret "notice" with respect to the timeliness of court filings in 42 U.S.C. § 2000e-5(f)(1)); *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 281-82 (3d Cir. 2002) (finding express delegation of authority to Secretary of Health & Human Services to promulgate guidelines for Medicare reimbursement reclassification of hospitals was "adequate indication of congressional intent" supporting *Chevron* deference).

## B.

We begin the process of statutory interpretation with the plain meaning of the statute—we must first consider the text. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1498 (3d Cir. 1996). The parties do not dispute that, under § 106(6), AM/FM webcasting comprises a public digital audio transmission.[10]

---

Judges Roth and Cudahy would both have concluded that, under *Mead*, the Copyright Office's interpretation of § 114(d)(1)(A) should be given *Skidmore* deference because the only express delegation of authority in Title 17 that can be construed to cover the Copyright Office's Streaming Regulation is the broad general authority under § 702 "to establish regulations not inconsistent with law for the administration of the functions and duties made the responsibility of the Register under this title." They find this language insufficient to shift the responsibility of interpreting what is copyright-protected from the courts, the traditional stewards of such property rights, to the Copyright Office, which has no history of, or significant expertise in, such a role. Judge Smith, on the other hand, maintains that this approach reads too much into *Mead*. He believes that *Mead*, in considering what was an essentially adjudicative determination of an agency, merely created a limited exception to *Chevron*. He notes that the Supreme Court has continued to apply the basic framework of *Chevron*, and has reiterated the obligation of courts to afford *Chevron* deference to a vast array of legislative decisions made by agencies. *See Barnhart v. Walton*, 122 S.Ct. 1265, 1269-72 (2002)(noting that even where an "[a]gency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, *see* 5 U.S.C. Section 553," this "does not automatically deprive that interpretation of the judicial deference otherwise its due.")(citing *Chevron,* 467 U.S. at 843). He would conclude that, even in the wake of *Mead,* the product of notice and comment rulemaking pursuant to express statutory authority (even of the general kind present here) should still be accorded *Chevron* deference.

10. 17 U.S.C. § 101, which defines terms as used in Title 17, defines "transmit": "To 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." Additionally, legislative history makes clear that "transmit" is to be interpreted very broadly. *See* S. Rep. No. 94-473, at 61 (1975) ("1975 Senate Report") (App. at A474) ("The definition of 'transmit' . . . is broad enough to include all conceivable forms and combinations of wired or wireless communication media . . . .").

Thus, in order for AM/FM webcasting to be exempt under § 114(d)(1)(A) from the digital audio transmission performance copyright, it must be 1) noninteractive, 2) nonsubscription and 3) broadcast. The parties agree that AM/FM webcasting is not part of an interactive service.[11] There is equally no dispute that AM/FM webcasting is a nonsubscription transmission.[12] Thus, the question

---

11. 17 U.S.C. § 114(j)(7) provides that:

An "interactive service" is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient. The ability of individuals to request that particular sound recordings be performed for reception by the public at large, or in the case of a subscription service, by all subscribers of the service, does not make a service interactive, if the programming on each channel of the service does not substantially consist of sound recordings that are performed within 1 hour of the request or at a time designated by either the transmitting entity or the individual making such request. If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service.

12. 17 U.S.C. § 114(j) provides in relevant part:

(9) A "nonsubscription" transmission is any transmission that is not a subscription transmission.

* * *

(14) A "subscription" transmission is a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission.

Additionally, the legislative history makes clear that Internet transmissions can be either subscription or nonsubscription. *See* S. Rep. No. 104-128, at 36 (1995) ("1995 Senate Report") (App. at A735) ("It does not matter what the mechanism might be for the delivery of the transmission; thus, a digital transmission, whether delivered by cable, wire, satellite or terrestrial microwave, video dialtone, the Internet or any other digital transmission mechanism, could be a subscription transmission if the requirements cited above are satisfied.")

becomes whether AM/FM webcasting is a "broadcast transmission."

For a definition of "broadcast transmission," we look to § 114(j), which defines terms as used in the section. Section 114(j)(3) tells us that a " 'broadcast' transmission is a transmission made by a terrestrial broadcast station licensed as such by the Federal Communications Commission." This merely moves us to a new inquiry: what is a "terrestrial broadcast station licensed as such by the [FCC]"? "Terrestrial" we give its natural and logical meaning of earthbound. The appellees seek to import a sense of limitation of a transmission's geographic range into the meaning of "terrestrial." *See* Peters Opening Br. at 31 ("Thus, the use of the word 'terrestrial' suggests that Congress had in mind transmissions . . . within limited geographic ranges. . . ."). This reading of "terrestrial" is unnaturally strained, and we will not distort the plain meaning so. We believe that the present case deals only with "terrestrial" broadcast stations (whatever "broadcast station" may be determined to mean). Therefore, a more nuanced parsing of the exact parameters of "terrestrial" is not necessary for the resolution of the present case.

The nub of the interpretive disagreement between the two sides is whether a "broadcast station" refers to the broadcaster as a business entity that operates broadcasting facilities or to the broadcasting facilities themselves (and by extension the mode of transmission). If the appellants are correct then a "broadcast station" refers to the broadcasting entity and not to the physical transmitting facility. As a result, for example, any transmission (including webcasting) by any facility operated by Clear Channel Communications, Inc. (an entity operating a radio broadcasting facility under an FCC license) would qualify as a broadcast transmission. So long as the transmission was noninteractive and nonsubscription (*e.g.*, AM/FM webcasting), it would be an exempt transmission under § 114(d)(1)(A). In comparison, if the Copyright Office's interpretation is correct, then § 114(j)(3)'s "broadcast station" is limited to a radio broadcasting facility, and all forms of webcasting of recorded music, whether AM/FM webcasting or webcasting in some other form, are covered

by the digital audio transmission performance copyright in § 106(6) and are not exempt.

Although not dispositive, we can initially point to some obvious and irreconcilable consequences of the appellants' argument that "broadcast station" refers to the entity, not the facility. One such consequence would be that any entity that operates at least one FCC-licensed radio station would have carte blanche to digitally perform recordings via any conceivable transmission medium (in a noninteractive, nonsubscription manner) without limitation or copyright liability under § 106(6). For example, the "sound recording performance complement," which limits statutory licensees' ability to transmit performances of multiple recorded songs from the same artist or from the same "phonorecord" within a short time of each other, would not apply to any transmission by an FCC-licensed broadcaster. *See* 17 U.S.C. § 114(d)(2)(C)(i), (j)(13). Additionally, the appellants in the present case could hypothetically expand their webcasting to include original programming unrelated to their AM/FM programming, and their interpretation of "nonsubscription broadcast transmission" would serve to exempt that webcasting from the digital audio transmission performance copyright as well. Against that possibility, appellants argue that the "sole issue before the Copyright Office for rulemaking, and the sole issue presented in this declaratory judgment action, is whether the simultaneous Internet streaming of the *same* program fare as offered by broadcasters pursuant to their FCC licenses qualifies for the Section 114(d)(1)(A) exemption." Appellants' Br. at 35 (emphasis in original). But appellants put forward (and we can find) no limiting principle in their argument with respect to the definition of "broadcast station" that would restrict the product of their argument to "simultaneous Internet streaming" of AM/FM programming.

Another ramification of the broadcasters' interpretation about which they are quite pointedly silent, is that the meaning of the modifier "terrestrial" becomes absurd. Under the appellants' argument, a terrestrial broadcast station means a business entity that is earthbound—in contrast, we must assume, to one that is space-borne. To our knowledge, there are not, presently, any broadcasting

companies incorporated in outer space—nor can there be. An interpretation of "terrestrial broadcast station" that distinguishes between earthbound and orbiting broadcasting entities is unpersuasive—especially when there is a far more natural interpretation available. But it is entirely plausible to postulate entirely earthbound broadcasting *facilities* as opposed to broadcasting done through satellites.

Because the "broadcast station" in question is one that must be "licensed as such by the [FCC]," our interpretive quest leads us next to the licensing regime of the FCC. The Federal Communications Act, 47 U.S.C. §§ 151 et seq. ("FCA")[13] is the source of such licensing.

For the relevant definitions, we look to 47 U.S.C. § 153:

> (5) Broadcast station. The term "broadcast station", "broadcasting station", or "radio broadcast station" means a radio station equipped to engage in broadcasting as herein defined.

---

13. The broadcasters complain that it is inappropriate to cross-reference to the Federal Communications Act. Other sections of Title 17 refer expressly to the Federal Communication Act. *See, e.g.*, 17 U.S.C. §§ 114(b), (d)(1)(B)(iv), (d)(1)(C)(iii) (referring to 47 U.S.C. §§ 397, 396(k) and 522(12), respectively); 17 U.S.C. § 1202(e)(3)(A) ("As used in this subsection, the term 'broadcast station' has the meaning given that term in section 3 of the Communications Act of 1934."). The broadcasters argue that if Congress had intended to cross-reference to Title 47, it could have done so explicitly. We believe that Congress in fact did so. By demanding that the broadcast station of § 114(d)(1)(A) be licensed by the FCC as a broadcast station, Congress quite clearly incorporated by reference definitions from the Federal Communications Act. Additionally, the broadcasters have, in other parts of their argument, acknowledged that the Federal Communications Act (and other related statutes) are relevant to our understanding of the copyright provisions at issue. *See, e.g.*, Appellants' Br. at 37 n.14, 43 n.17 (using Title 47 to help define "terrestrial" and "public interest" in Title 17). We have held that a "prior statute's definition of [a] term will control if it is natural and reasonable to think that the members of the legislature, in drafting the new statute, were influenced by the prior statute." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823-24 (3d Cir. 1999). We believe such is the case here.

> (6) Broadcasting. The term "broadcasting" means the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations.

The combination of § 153(5) and § 153(6) of the FCA would limit a "broadcast station" to a physical facility that transmits radio communications—appellees' position exactly. However, we must consider the entirety of the relevant phrase—"broadcast station licensed as such by the [FCC]"—and determine whether the FCA provides any guidance with respect to what it means by the phrase "licensed as such." Appellants seek to have us equate a "licensee" with the "broadcast station licensed as such by the [FCC]." A licensee under the FCA is a person (or entity), not a facility. *See, e.g.*, 47 U.S.C. §§ 153(24) ("The term 'licensee' means the holder of a radio station license. . . ."), 301 ("No person" shall transmit radio except "with a license."), 307(c)(1) (licenses are "granted for the operation of a broadcasting station"), 310 (restricting the ownership and transfer of licenses by and to certain individuals). This argument affords a superficial appeal, since a common usage of the term "licensed" often has as its subject a person seeking to perform a sanctioned act. A person, for example, is the "licensee" who is "licensed" to drive a car.

However, it is also clear that a "station" that is "licensed" is something other than a "licensee," and, in fact, means a physical broadcasting facility. The acquisition (or modification or renewal) of a broadcast station license under the FCA is inextricably linked to the operation of a specific broadcast facility (referred to, harmoniously, as a broadcast or broadcasting station), and more specifically to the location and broadcasting qualities of that facility. 47 U.S.C. §§ 307(c)(1) ("Each license granted for the operation of a broadcasting station. . . ."), 308(b) ("All applications for station licenses . . . shall set forth . . . the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; . . . the purposes for which the station is to be used . . . ."), 309(h)(1) ("The station license shall not vest in the licensee any right to operate the station . . . . in any other manner than

authorized therein . . . ."); 47 C.F.R. § 73.1020(a) ("Initial licenses *for broadcast stations* . . . .) (emphasis added); 47 C.F.R. § 73.3538 (implemented by FCC Form 302) (detailing the types of changes in a broadcasting facility that require an application for license modification, including a multitude of technical changes affecting the nature and quality of the radio transmissions by the broadcasting facility). In this sense the FCA, when authorizing the issuance of a license, exercises a licensing power over the facility that will be operated under the license. The license, while not literally held by the transmitting facility is inseparable from that facility—and that connection (and concomitant regulation) makes the station "licensed."

Therefore, a "licensee" means something distinct from a "broadcast station licensed as such." The licensee is the person (or entity) holding the license, and the licensed station is the facility that the licensee is permitted to operate under the license. Based on this examination of the FCA, we believe it clear that a "broadcast station licensed as such by the [FCC]," as the term is used in 17 U.S.C. § 114(j)(3), refers to the physical radio station facility that broadcasts radio signals over the air, and not to the business entity that operates the radio station. A "broadcast transmission" under § 114(d)(1)(A) would therefore be a radio transmission by a radio station facility operated subject to an FCC license and would not include a webcast. AM/FM webcasting does not meet the definition of a "nonsubscription broadcast transmission" and does not, therefore, qualify under § 114(d)(1)(A) for an exemption from the digital audio transmission performance copyright of § 106(6).

### C.

Additionally, further examination of the statute using the remaining tools of statutory interpretation only confirms what follows from the statute's language. For example, we consider other parts of § 114 to see if our interpretation of § 114(d)(1)(A) harmonizes with the section as a whole. *United States v. Morton,* 467 U.S. 822, 828 (1984) (noting that, generally, statutes should be read as a whole). Also, we consider legislative history to gain an indication of

unambiguous Congressional intent that may aid our interpretation. *See New Rock Asset Partners*, 101 F.3d at 1498.

First, we consider the remainder of 17 U.S.C. § 114. Of particular interest is § 114(d)(1)(B), which lays out an exemption from the digital audio transmission performance right for *re*transmissions of nonsubscription broadcast transmissions.[14] The appellees argue that the § 114(d)(1)(A) broadcast exemption as interpreted by the broadcasters is inconsistent with this retransmission exemption. Subsection (d)(1)(B)(i)(I) refers to retransmission by "a terrestrial broadcast station, terrestrial translator, or terrestrial repeater licensed by the [FCC]." Translators and repeaters are, first of all, technical equipment—a form of facilities. *See* 47 C.F.R. §§ 21.2, 74.1201(a) (definitions). The inclusion of "broadcast station" as a means of retransmission in this list together with "translator" and "repeater" suggests that a broadcast station is also a physical facility. Plus, interpreting "broadcast station" as an FCC-licensed business entity would render superfluous the use of "translator" and "repeater." Any translators or repeaters "licensed as such by the [FCC]" would necessarily be owned by a licensee. Under the appellants' interpretation, that licensee, as an entity that operates broadcasting facilities, would be a "broadcast station." Therefore, the phrase "broadcast station" would include the

---

14. The retransmissions listed in 17 U.S.C. § 114(d)(1)(B) as exempt from the performance right of § 106(6) include:

(B)  a retransmission of a nonsubscription broadcast transmission: *Provided*, That, in the case of a retransmission of a radio station's broadcast transmission—

    (i)  the radio station's broadcast transmission is not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the radio broadcast transmitter, however—

        (I)  the 150 mile limitation under this clause shall not apply when a nonsubscription broadcast transmission by a radio station licensed by the Federal Communications Commission is retransmitted on a nonsubscription basis by a terrestrial broadcast station, terrestrial translator, or terrestrial repeater licensed by the Federal Communications Commission;

facilities of a repeater or translator, and make their listing superfluous. *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (listing familiar canon of statutory interpretation that statutes should be interpreted to give meaning to each word). Additionally, the words "broadcast station," "translator" and "repeater" are all modified by the phrase "licensed by the [FCC]." That translators and repeaters (both physical facilities) are described as licensable by the FCC further supports the textual conclusion, above, that the broadcast station licensed as such by the FCC in § 114(j)(3) is the physical transmitting facility.

Likewise, § 114(d)(1)(B) limits the *re*transmission of a nonsubscription broadcast transmission to a radius of 150-miles. As the district court sagely recognized, it makes little sense to exempt AM/FM webcasting, which is global in nature, while simultaneously limiting retransmission to a 150-mile radius. *Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 776 (E.D. Pa. 2001). The absurdity of this construction is apparent when one considers that, under the appellants' interpretation, the webcasting of AM/FM programming by the original broadcaster would be exempt under § 114(d)(1)(A) and transmissible world wide over the Internet without any § 106(6) limitations. However, if a third party webcaster (that did not hold any FCC licenses), such as Yahoo, were to *re*transmit via webcast *the exact same AM/FM programming*, that third party would unavoidably be covered by the digital audio transmission performance right in § 106(6), and not exempt. If, as the broadcasters protest, congressional intent were simply to protect the broadcaster-recording industry relationship wherein "the sale of sound recordings has been promoted by the airplay decisions of radio broadcasters," what possible purpose could be served by distinguishing between different purveyors of that exact same airplay decision? Appellants' Br. at 55. We are not convinced that there is a coherent principle distinguishing a third party retransmitter of the same programming and requiring that the third-party "stand on a different footing." *Id.* at 56. A common-sense reading of § 114(d)(1)(B) in light of § 114(d)(1)(A) is that the express geographic limitation on third party retransmissions in § 114(d)(1)(B) cannot coexist

with the unlimited geographic reach of AM/FM webcasting proposed by the appellants for § 114(d)(1)(A). A far more harmonious reading of § 114 is achieved if § 114(d)(1)(A) is limited to over-the-air broadcasting, and all forms of webcasting are nonexempt from § 106(6). The retransmission provisions of § 114(d)(1)(B) strongly favor the Copyright Office's interpretation of § 114(d)(1)(A).

### D.

A consideration of the legislative history of the DPRA and the DMCA also reinforces our conclusions. Starting with the DPRA, it is apparent that the public performance right of § 106(6) was originally intended to be limited in scope. *See* 1995 Senate Report, at 19 (App. at A718) ("[U]nder [§ 114(d)(1)(A)], any transmission to members of the public that is neither a subscription transmission . . . nor part of an interactive service is exempt from the new digital performance right."). This new right was expressly limited in knowing opposition to policies preferred by the Copyright Office at the time:

> Notwithstanding the views of the Copyright Office . . . that it is appropriate to create a comprehensive performance right for sound recordings, the Committee has sought to address the concerns of record producers and performers regarding the effects that new digital technology and distribution systems might have on their core business without upsetting the longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all of these industries well for decades. Accordingly, the Committee has chosen to create *a carefully crafted and narrow performance right*, applicable only to *certain* digital transmissions of sound recordings.

*Id.* at 13 (App. at A712) (emphasis added). *See also* 1995 House Report, at 13-14 (App. at A777). Congress had in mind the symbiotic relationship between the recording industry and broadcasters, and did not seek to change the existing relationship. *See* 1995 Senate Report, at 15 (App.

at A714) ("It is the Committee's intent to provide copyright holders of sound recordings with the ability to control the distribution of their product by digital transmissions, without hampering the arrival of new technologies, and without imposing new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings."). To that end, the DPRA, as enacted, contained a much broader exemption from the § 106(6) performance right than is presently the case. *See* note 5, supra. The legislation did "not affect the interests of broadcasters, as that industry has traditionally been understood." 141 Cong. Rec. 1292 (1995) (Sen. Hatch, introducing the bill that became the DPRA). "If the technological status quo could be maintained, it might well be that the current laws could be tolerated. But, we know that technological developments such as satellite and digital transmission of recordings make sound recordings vulnerable to exposure to a vast audience through the initial sale of only a potential handful of records." *Id.* at 1293

Intervening technological developments did, ultimately, require further legislation. Section 114(d)(1)(A) was amended in the DMCA "to delete two exemptions that were either the cause of confusion as to the application of the DPRA to certain nonsubscription services (especially webcasters) or which overlapped with other exemptions (such as the exemption in subsection (A)(iii) for nonsubscription broadcast transmissions). The deletion of these two exemptions is not intended to affect the exemption for nonsubscription broadcast transmissions." 1998 Conference Report, at 80 (App. at A1197). Congress sought to "clarif[y] that the digital sound recording performance right applies to nonsubscription digital audio services such as webcasting." Staff of the House Comm. on the Judiciary, Section-by-Section Analysis of H.R. 2281 As Passed by the United States House of Representatives on August 4, 1998, 105th Cong., 2d Sess., at 50 (Committee Print, Serial No. 6, 1998) ("1998 House Manager's Report") (App. at 1087).

In 1995, while the DPRA was being crafted, no serious attention was paid to the specific possibility that radio

broadcasters would simultaneously stream their AM/FM programming over the Internet. The central question then is somewhat broader: whether, in exempting "nonsubscription broadcast transmissions," Congress intended the DPRA to exempt *nontraditional* transmissions by broadcasters. The answer appears to be solidly in the negative. Congress decided "not to include free *over-the-air* broadcast services in this legislation" in part because broadcasters provide "public interest activities to local communities to fulfill a condition of the broadcasters' license." 1995 Senate Report, at 15 (App. at 714) (emphasis added); 1995 House Report, at 13 (App. at A778). Referring to the benefits of "free *over-the-air* broadcasting," the same reports reiterate that the "legislation should do nothing to change or jeopardize the mutually beneficial economic relationship between the recording and traditional broadcasting industries." *Id.* (emphasis added). "The classic example of [an exempt transmission under section 114(d)(1)(A)] is a transmission to the general public by a free *over-the-air* broadcast station, such as a traditional radio or television station, and the Committee intends that such transmissions be exempt regardless of whether they are in a digital or nondigital format, in whole or in part." 1995 Senate Report, at 19 (App. at 718) (emphasis added).

The appellants argue, however, that the unambiguous intent of Congress to exempt AM/FM webcasting is clear in the 1995 Senate Report, which stated that "[t]he underlying rationale for creation of this limited [digital audio recorded performance] right is grounded in the way the market for prerecorded music has developed, and the potential impact on that market posed by subscription and interactive services—but not by broadcasting *and related transmissions.*" *Id.* at 17 (App. at A716) (emphasis added). This, they argue, favors a broad interpretation of the scope of Congress's intended protection of the broadcaster-recording industry relationship. We believe that this single sentence, out of context, provides little support for the broadcasters' position. An interpretation of this sentence more in harmony with the remainder of the DPRA is that a "related transmission" refers to the other types of transmissions (other than a broadcast transmission) expressly exempted in § 114(d), such as retransmissions.

Appellants argue that this narrow reading of broadcast transmission makes the word "nonsubscription" in the phrase "nonsubscription broadcast transmission" surplusage, since all over-the-air broadcasts are currently nonsubscription broadcasts. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) (holding that each term in a statute should have a "particular, nonsuperfluous meaning"). We disagree. All over-the-air broadcasts are currently nonsubscription because they are analog. It is our understanding that analog radio technology is not capable of providing a subscription broadcast transmission. In comparison, §§ 106 and 114 are concerned with *digital* transmissions. With digital over-the-air transmission technology it is possible for transmitters to provide their transmission services on a subscription basis.[15] Inasmuch as the legislative history indicates that Congress was anticipating the technology of digital radio when it formulated § 114(d)(1)(A), 1995 Senate Report, at 19 (App. at A718) ("[T]he Committee intends that [over-the-air] transmissions be exempt regardless of whether they are in a digital or nondigital format, in whole or in part."), we find it perfectly reasonable to conclude that Congress was also anticipating that digital radio potentially could give rise to subscription radio services and chose expressly to distinguish such services from nonsubscription digital over-the-air radio services.

Appellants also make much of the fact that "webcasting," as it was generally defined at the time of DMCA, referred to "public multiple highly-themed genre channels of sound recordings on a nonsubscription basis." 1998 House Manager's Report, at 50 (App. at A1087). Under the appellants' theory, the performance right in § 106(6) must

---

15. For example, XM Radio, which provides a digital radio signal through a satellite broadcasting mechanism, charges a monthly subscription fee for access to its digital radio service. A digital radio over-the-air signal, unlike traditional analog radio, is not unavoidably free of cost to consumers. For commercial reasons it appears, however, that non-satellite digital radio will likely debut in this country in a nonsubscription format. *See* Justin Hibbard, *Top Ten Trends 2003 — Broadcasting*, Red Herring, Nov. 15, 2002, at 48 (available at 2002 WL 16030972).

be construed as narrowly as possible and the exemption in § 114(d)(1)(A) as broadly as possible. The changes wrought by the DMCA to reduce the § 114(d)(1) exemptions to the digital audio transmission performance right, under the appellants' theory, must also be construed narrowly in order to preserve the intended, narrow scope of the § 106(6) copyright. Therefore, in interpreting the DMCA, according to the appellants, the scope of the DMCA's reductions in the § 114(d)(1) exemptions (and the corresponding expansion of the scope of the digital audio transmission performance copyright) must be narrowly defined to include only the precise type of webcasting contemplated by Congress at that time. Under this argument, because AM/FM webcasting was not exactly what Congress contemplated when it adopted the DMCA, AM/FM webcasting was not meant to be included in the § 106(6) performance right.[16] But it is clear to us that Congress did not intend to tie the scope of the DMCA to such a narrow definition. "While an impetus for this legislation was the licensing difficulties and legal issues raised by webcasters in particular, it is Congress' intent that this legislation apply generally to otherwise nonexempt nonsubscription digital audio services on the Internet and in other media." 1998 House Manager's Report, at 50 (App. at A1087).

Additionally, we have already noted that the exemptions the DPRA afforded to radio broadcasters were specifically intended to protect only traditional radio broadcasting, and did not contemplate protecting AM/FM webcasting. The DMCA's silence on AM/FM webcasting gives us no affirmative grounds to believe that Congress intended to *expand* the protections contemplated by the DPRA. The appellants must show something more than congressional silence to argue convincingly that Congress intended to lump AM/FM webcasting with over-the-air broadcasting in § 114(d)(1)(A)'s exemption.

The legislative history shows that DPRA § 114(d)(1)(A)(iii) created a nonsubscription broadcast transmission

---

16. This argument operates in tandem with appellants' plain language argument, which gives "nonsubscription broadcast transmission" a broad scope. *See* discussion, supra at § II(B).

exemption for traditional over-the-air broadcasting in order to preserve the symbiotic relationship between broadcasters and the recording industry. And the DMCA's amendments to § 114(d) were "not intended to affect the exemption for nonsubscription broadcast transmissions." 1998 Conference Report, at 80 (App. at A1197). Therefore, the purpose of Congress was to limit the exemption for nonsubscription broadcast transmissions to traditional, over-the-air broadcasts.

## III.

For the reasons stated above, our analysis of § 114(d)(1)(A) convinces us that the Copyright Office's arguments are persuasive. Section 114(d)(1)(A)'s nonsubscription broadcast transmission's exemption implicates only over-the-air radio broadcast transmissions, and does not cover the internet streaming of AM/FM broadcast signals. Therefore, we AFFIRM.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*