**MEDICAL SOCIETY OF NEW JERSEY, Plaintiff,**

v.

**Mary Lou MOTTOLA, Executive Director of the Medical Practitioner Review Panel, and Reni Erdos, Director of the Division of Consumer Affairs, Defendants,**

**and**

**North Jersey Media Group, Inc. d/b/a The Record, Intervener–Defendant.**

**Civ. No. 04–2126 (WGB).**

United States District Court, D. New Jersey.

June 8, 2004.

Kern Augustine Conroy & Schoppmann, P.C., by Robert J. Conroy, Esq., Bridgewater, NJ, for Plaintiff.

Peter C. Harvey, Attorney General of New Jersey, by Steven N. Flanzman, Esq., Deputy Attorney General, Newark, NJ, for Defendants.

North Jersey Media Group, Inc., by Dina L. Sforza, Esq., Hackensack, NJ, for Intervener–Defendant.

**OPINION**

BASSLER, District Judge.

This matter comes before the Court on the motion of plaintiff Medical Society of New Jersey ("MSNJ" or "Plaintiff") for an order enjoining Mary Lou Mottola, Executive Director of the Medical Practitioner Review Panel, and Reni Erdos, Director of the Division of Consumer Affairs, both sued in their official capacities (collectively "Defendants"), from publishing information regarding settlement agreements of malpractice claims entered into by New Jersey doctors. Specifically, Plaintiff's motion seeks two forms of relief from this Court. First, Plaintiff seeks to enjoin Defendants from enforcing the New Jersey Health Care Consumer Information Act, N.J.S.A. § 45:9–22.21, *et seq.* ("NJHCCIA"), which was enacted by the New Jersey Legislature on June 23, 2003 and is scheduled to become effective June 23, 2004. Second, Plaintiff seeks to enjoin Defendants from disclosing to North Jersey Media Group, Inc., d/b/a *The Record* ("*The Record*") certain information contained on medical malpractice payment notices submitted to the State of New Jersey ("the State" or "New Jersey") pursuant to N.J.S.A. § 17:30D–17.

Defendants oppose the motion for preliminary injunction and cross-move to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(1) & (6).

*The Record,* a daily newspaper with circulation in northern New Jersey, moved to intervene in this action and filed opposition to Plaintiff's request for injunctive relief.

This Court properly exercises jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).

This Court held oral argument on June 7, 2004 and issued an oral Opinion from the bench as well as a written Order. This

Opinion supercedes the Court's oral Opinion on June 7th.

For the reasons stated below, Plaintiff's motion for preliminary injunctive relief is **denied**. Defendants' motion to dismiss pursuant to Rule 12(b)(1) is **denied**, and the motion pursuant to Rule 12(b)(6) is **granted**.

## BACKGROUND

MSNJ was founded in 1766 and is the nation's oldest state society of physicians. Approximately 8,000 physicians hold individual memberships in MSNJ, and MSNJ is one of New Jersey's leading voices representing doctors in the health care field.

MSNJ moves for a preliminary injunction on two distinct grounds. First, MSNJ seeks to enjoin Defendants from enforcing the NJHCCIA, in particular the section mandating that medical malpractice data be made available to the public through the Internet and a toll-free consumer phone line. Second, MSNJ seeks to enjoin Defendants from complying with a March 9, 2004 Order of the Honorable Sybil R. Moses, Assignment Judge, Superior Court of New Jersey, Bergen County, which ordered Defendants to disclose to *The Record* certain information contained on medical malpractice payment notices submitted to the State Board of Medical Examiners pursuant to New Jersey law.

## I. STATUTORY FRAMEWORK

### A. *Federal Law*

In 1986, Congress passed the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101, *et seq.* The HCQIA requires that certain information regarding malpractice payments, sanctions, and professional review actions taken with respect to medical professionals be reported to the federal government. 42 U.S.C. §§ 11131–7 (Subchapter II). Specifically, the HCQIA requires that "[e]ach entity (including an insurance company) which makes payment under a policy of insurance, self-insurance, or otherwise in settlement (or partial settlement) of, or in satisfaction of a judgment in, a medical malpractice action or claim shall report . . . information respecting the payment and circumstances thereof." 42 U.S.C. § 11131(a). The information reported pursuant to the HCQIA includes:

(1) the name of any physician or licensed health care practitioner for whose benefit the payment is made,

(2) the amount of the payment,

(3) the name (if known) of any hospital with which the physician or practitioner is affiliated or associated,

(4) a description of the acts or omissions and injuries or illnesses upon which the action or claim was based, and

(5) such other information as the Secretary determines is required for appropriate interpretation of information reported under this section.

*Id.* § 11131(b).

The regulations promulgated pursuant to the HCQIA established the National Practitioner Data Bank ("Data Bank") to collect and organize the reported information as required by the HCQIA. 45 C.F.R. § 60.1. The Data Bank created a centralized clearinghouse for state licensing boards, hospitals and other healthcare entities to obtain relevant background information about physicians. An insurer must, within 30 days of payment, directly report to the Data Bank all medical malpractice payments, including settlements and partial settlements, made with respect to each insured physician. 45 C.F.R. § 60.7.

Hospitals are required to request information from the Data Bank with respect to each physician or health care practitioner who applies for staff membership or clinical privileges. 42 U.S.C. § 11135. Insurance carriers are required not only to make reports to the Data Bank but also to

the appropriate state licensing board. 42 U.S.C. § 11134(c); 45 C.F.R. § 60.7. Moreover, the Data Bank makes the information it collects available "to State licensing boards, to hospitals, and to other health care entities (including health maintenance organizations) that have entered (or may be entering) into an employment or affiliation relationship with the physician or practitioner or to which the physician or practitioner has applied for clinical privileges or appointment to the medical staff." 42 U.S.C. § 11137(a).

Section 11137 outlines the confidentiality provisions applicable to the information collected pursuant to the HCQIA. Specifically, the HCQIA mandates:

> Information reported under this subchapter is considered confidential and shall not be disclosed (other than to the physician or practitioner involved) except with respect to professional review activity ... or in accordance with regulations of the Secretary promulgated pursuant to subsection (a) of this section. *Nothing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclosure.* Information reported under this subchapter that is in a form that does not permit the identification of any particular health care entity, physician, other health care practitioner, or patient shall not be considered confidential.

42 U.S.C. § 11137(b)(1)(emphasis added). Accordingly, unless otherwise provided by state law, all information collected by the Data Bank and "reported under this subchapter" is presumed confidential and is released only as specifically mandated by the HCQIA.

### B. New Jersey Reporting Requirements and the Medical Practitioner Review Panel

The Division of Consumer Affairs is a division of the Department of Law and Public Safety of the State of New Jersey. The Medical Practitioner Review Panel ("the Panel") is a component of the Division of Consumer Affairs.[1]

In 1983, three years before Congress passed the HCQIA, the New Jersey Legislature enacted N.J.S.A. § 17:30D–17, which created reporting requirements similar to those in what would become the HCQIA. The original version of N.J.S.A. § 17:30D–17 required notice of malpractice settlements over $25,000 to be sent to the State Board of Medical Examiners within seven (7) days of settlement. N.J.S.A. 17:30D–17 (Historical and statutory notes).

In 1989, N.J.S.A. § 17:30D–17 was amended and other notable changes were made to the statutory framework. First and foremost, the Panel was created pursuant to N.J.S.A. § 45:9–19.8. The Panel is authorized and required to receive notices from health care facilities or health maintenance organizations detailing actions those entities may take against practitioners, as well as notices "from an insurer or insurance association or a practitioner, ... regarding a medical malpractice claim settlement, judgment or arbitration award or a termination or denial of, or surcharge on, the medical malpractice liability insurance coverage of a practitioner . . . ." N.J.S.A. § 45:9–19.9(a)(1)–(2). The Panel is empowered to investigate all notices and complaints received and to recommend appropriate action to the State Board of Medical Examiners. *Id.* at 45:9–19.9(c).

---

1. Plaintiff originally named the State of New Jersey, the Division of Consumer Affairs and the Medical Practitioner Review Panel as defendants in this action. At oral argument on June 7, 2004, the Court permitted Plaintiff to amend the Complaint and substitute the currently named Defendants.

The 1989 amendments also changed the reporting requirements outlined in N.J.S.A. § 17:30D–17, which requires insurance companies and individual practitioners to report to the Panel any malpractice claim settlement, judgment or award.

Any insurer or insurance association authorized to issue medical malpractice liability insurance in the State shall notify the Medical Practitioner Review Panel established pursuant to section 8 of P.L. 1989, c. 300 (C.45:9–19.8) in writing of any medical malpractice claim settlement, judgment or arbitration award involving any practitioner licensed by the State Board of Medical Examiners and insured by the insurer or insurance association. Any practitioner licensed by the board who is not covered by medical malpractice liability insurance issued in this State, who has coverage through a self-insured health care facility or health maintenance organization, or has medical malpractice liability insurance which has been issued by an insurer or insurance association from outside the State shall notify the review panel in writing of any medical malpractice claim settlement, judgment or arbitration award to which the practitioner is a party.

N.J.S.A. § 17:30D–17.

In addition to these reporting requirements, New Jersey law requires that the Panel maintain records of all such notices. N.J.S.A. § 45:9–19.10(a) ("The review panel shall maintain records of all notices and complaints it receives and all actions taken with respect to the notices and complaints."). Currently, these records are protected by certain privacy provisions, namely N.J.S.A. §§ 45:9–19.3 & 45:9–19.10(c).[2]

A main point of disagreement between the parties in this action is how the HCQIA interacts, if at all, with the State reporting requirements. The parties agree that the information at issue, namely data regarding malpractice claim settlements and the amount of those settlements, is reported to the federal government pursuant to the HCQIA and to the State pursuant to its statutory framework. Therefore, the HCQIA requires insurers to provide to the federal government the very same information that N.J.S.A. § 17:30D–17 requires that they submit to the State. In practice, insurance companies routinely comply with their State law reporting obligation by providing the Panel with a paper copy of the report that the insurance carrier submits to the Data Bank, pursuant to the HCQIA. (Mottola Cert. ¶ 4.)

Although the parties agree that the data collected by both the HCQIA and N.J.S.A. § 17:30D–17, with regards to

2. N.J.S.A. § 45:9–19.3 provides:
Any information concerning the conduct of a physician or surgeon provided to the State Board of Medical Examiners ... is confidential pending final disposition of the inquiry or investigation by the board.... If the result of the inquiry or investigation is a finding of no basis for disciplinary action by the board, the information shall remain confidential, except that the board may release the information to a government agency, for good cause shown, upon an order of the Superior Court after notice to the physician or surgeon, who is the subject of the information, and an opportunity to be heard. The application for the court order shall be placed under seal.
N.J.S.A § 45:9–19.10(c) provides:
Any information concerning the professional conduct of a practitioner provided to, or obtained by, the review panel is confidential pending final disposition of an inquiry or investigation of the practitioner by the State Board of Medical Examiners....
As will be discussed in more detail *infra*, once the NJHCCIA becomes operative in June 2004, these two privacy provisions will no longer apply to certain information regarding medical malpractice judgments, settlements and arbitration awards.

medical malpractice information, is identical, the parties' respective interpretations of the interplay between the two statutory frameworks is significantly different. Plaintiff contends that the HCQIA amounts to a federal protection of privacy that supercedes rights afforded under the State statute, while Defendants and *The Record* argue that the two statutes set forth obligations that are separate and distinct.

## C. *New Jersey Health Care Consumer Information Act*

In this action Plaintiff also challenges the constitutionality of the NJHCCIA, N.J.S.A. § 45:9–22.21, *et seq.*, which was enacted into law on June 23, 2003, to be effective upon the 365th day following enactment.[3] The NJHCCIA requires the Division of Consumer Affairs to create profiles for all licensed physicians and podiatrists in New Jersey and to make these profiles available to the public, both by electronic and other means. *Id.* § 45:9–22.22(a). The profiles will include, *inter alia,* the medical school education and post-graduate medical training of each practitioner, the year of initial licensure in New Jersey or elsewhere, the location of office practice sites, and certain information concerning criminal convictions, board disciplinary actions, and hospital privilege actions. *Id.* § 45:9–22.23.

In addition, the NJHCCIA provides for the disclosure of medical malpractice judgments and settlements as part of each practitioner's profile. The NJHCCIA mandates the publication of:

All medical malpractice court judgments and all medical malpractice arbitration

awards reported to the board, in which a payment has been awarded to the complaining party during the most recent five years, and all settlements of medical malpractice claims reported to the board, in which a payment is made to the complaining party within the most recent five years. . . .

*Id.* § 45:9–22.23(a)(10).

The NJHCCIA provides that pending medical malpractice claims shall not be included in the practitioner profiles, and information about these pending claims will not be disclosed to the public. *Id.* § 45:9–22.23(a)(10)(a). In addition, the profiles will identify those judgments that are being appealed. *Id.* § 45:9–22.23(a)(10)(b).

Each profile shall place the number of judgments, arbitration awards and settlements against each physician or podiatrist into one of three graduated categories: average, above average and below average number of judgments, settlements and awards. *Id.* § 45:9–22.23(a)(10)(c). "These groupings shall be arrived at by comparing the number of an individual physician's or podiatrist's medical malpractice judgments, arbitration awards and settlements to the experience of other physicians or podiatrists within the same speciality." *Id.*

Finally, the NJHCCIA provides that each profile shall include the a statement instructing consumers not to make negative inferences from the information published in the profile:

The following statement shall be included with the information concerning medical malpractice judgments, arbitration

**3.** There is disagreement between the parties as to the exact date the NJHCCIA becomes effective—MSNJ claims it becomes effective June 23, 2004, while Defendants claim it becomes effective June 22, 2004. Doctors in New Jersey have been notified by the State that the NJHCCIA will become effective on June 23rd. (Kornett Decl., Ex. C.) Therefore, the Court will assume, for the purposes of this motion, that the effective date of the NJHCCIA is June 23, 2004.

awards and settlements: "Settlement of a claim and, in particular, the dollar amount of the settlement may occur for a variety of reasons, which do not necessarily reflect negatively on the professional competence or conduct of the physician (or podiatrist). A payment in settlement of a medical malpractice action or claim should not be construed as creating a presumption that medical malpractice has occurred."

*Id.* § 45:9–22.23(a)(10)(d).

The very purpose behind the NJHCCIA is to make certain information about physicians more accessible to members of the public.[4] As a result, the privacy provisions outlined in N.J.S.A. §§ 45:9–19.3 & 45:9–19.10(c), which currently provide limited confidentiality protection to information released to the Panel pursuant to N.J.S.A. § 17:30D–17, are not applicable to the information included in the practitioner profiles under the NJHCCIA. Moreover, on the date the NJHCCIA becomes operative, the following language will be added to N.J.S.A. §§ 45:9–19.3 & 45:9–19.10(c) to provide an exception for information included in the profiles: "The provisions in this section shall not apply to information that the division, or its designated agent, is required to include in a physician's or podiatrist's profile pursuant to P.L.2003, c. 96."

The NJHCCIA provides that the Director of the Division of Consumer Affairs, "in consultation with the State Board of Medical Examiners, shall adopt regulations pursuant to the 'Administrative Procedure Act,' P.L. 1968, c. 410 (C.52:14B–1, *et seq.*) necessary to effectuate the purposes of this act." N.J.S.A. § 45:9–22.25. Practitioners were advised in writing of the manner in which information concerning malpractice histories shall be set forth in the profiles. In a letter dated April 26, 2004 the Director of the Division of Consumer Affairs, defendant Reni Erdos, advised licensed physicians and podiatrists in New Jersey as to the impending effective date of the NJHCCIA. (Kornett Decl., Ex. C.) The letter also included information regarding the database of practitioner profiles that will be available to consumers both over the Internet at *www.njdoctorlist.com* or by writing or calling the Division of Consumer Affairs' Profile Call Center.[5] (*Id.*) The April 26th letter encouraged practitioners to update their personal and professional information in order to ensure the most accurate profiles possible.

## II. PRIOR STATE COURT ACTION

*The Record* is a daily newspaper with circulation in northern New Jersey, specifically the City of Hackensack as well as Bergen and Passiac Counties. In March 2003, *The Record* began gathering information regarding medical malpractice payments made by or on behalf of medical practitioners licensed in New Jersey.

---

**4.** As an interesting side note, the NJHCCIA was enacted as part of a growing multi-state trend to provide citizens with better information about their physicians' backgrounds. In 1996, Massachusetts passed the Physician Profile Act and became the first state to publish physician malpractice histories, hospital disciplinary records and medical board warnings over the Internet and through a toll-free phone line. Mass. Gen. Laws ch. 112, § 5 (2000). Since that time, at least seven states have followed Massachusetts, among them California (Cal. Bus. & Prof.Code § 27 (2000)), New York (N.Y. Pub. Health Law § 2995–a (2000)), and Florida (Fla. Stat. ch. 456.041 (2001)). The Court may take judicial notice of these state statutes. *Lamar v. Micou*, 114 U.S. 218, 223, 5 S.Ct. 857, 29 L.Ed. 94 (1885). To the knowledge of this Court, there has been no challenge to the constitutionality of these statutes.

**5.** Although Plaintiff does not attach the April 26th letter as an exhibit to its Complaint, Plaintiff specifically references the letter in its Complaint. (Compl.¶¶ 60–62.)

During this process, *The Record* learned of the existence of the Panel and the requirements under N.J.S.A. § 17:30D–17 that notices of any medial malpractice claim settlement, judgment or arbitration award involving any practitioner licensed by the State Board of Medical Examiners be submitted to the Panel. (Lesser Decl. ¶ 3.)

On April 11, 2003, a specialty writer with *The Record* submitted a written request pursuant to the New Jersey Open Public Records Act, N.J.S.A. § 47:1A–1, *et seq.* ("OPRA"), to the Division of Consumer Affairs for, *inter alia*, every notice submitted pursuant to N.J.S.A. § 17:30D–17 by malpractice insurers or any other responsible body to the Panel notifying the Panel of malpractice payments. (Sforza Decl., Ex. C., 1/23/04 Tr. at 13 ("J. Moses Op."); Lesser Decl. ¶ 5, Ex. A.) *The Record's* OPRA request was denied by the Division of Consumer Affairs on April 23, 2003 based in part on the fact that the confidentiality provisions contained in N.J.S.A. §§ 45:9–19.3 & 45:9–19.10(c) allegedly exempted the notices from disclosure under OPRA. (J. Moses Op. at 13; Lesser Decl. ¶ 6.)

In August 2003, *The Record* brought an action, by way of order to show cause, in the Superior Court of New Jersey, Law Division, Bergen County, against the State of New Jersey, Division of Consumer Affairs and Medical Practitioner Review Panel (collectively "State Defendants").[6] The State action was captioned *North Jersey Media Group, Inc. v. State of New Jersey, Division of Consumer Affairs and the Medical Practitioner Review Panel,* Docket No. BER–L–5771–03.

In its complaint, *The Record* sought to compel the disclosure of the payment notices submitted by malpractice insurers or any other responsible body to the Panel

notifying the panel of malpractice payments. *The Record* sought the disclosure of this information both pursuant to OPRA and to the common law right to access.

In September 2003, State Defendants submitted opposition to *The Record's* application, and *The Record* learned, for the first time, that State Defendants maintained the information sought in a computer database. (Lesser Decl. ¶ 5.) Thus, concerns about the costs that State Defendants would bear in turning over the information to *The Record* were all but obviated. Additionally, at that time *The Record* amended its request to limit the information sought from the payment notices to the following four components: (1) name of physician; (2) license number; (3) date of payment; and (4) amount of payment.

The parties appeared before the Honorable Sybil R. Moses on October 14, 2003. During the course of the conference, the parties agreed that certain notices were exempt from disclosure under OPRA because they were protected by the confidentiality provision contained in N.J.S.A. §§ 45:9–19.3 & 45:9–19.10(c). (J. Moses Op. at 14–15.) *The Record,* seeking disclosure of all the payment notices during the previous five years, proceeded with its common law claim for access, and State Defendants submitted opposition to that claim. On January 23, 2004, Judge Moses, in a ruling from the bench, granted *The Record's* request for common law access to the payment notices. (*Id.* at 47–48.) In her oral opinion, Judge Moses made several key points. First, Judge Moses found that since insurers are required to submit the payment notices to the Panel pursuant to N.J.S.A. § 17:30D–17, the notices are, as a matter of law, common law public records. (*Id.* at 32–33.) Second, the court

---

**6.** State Defendants were the defendants previously named in this action, before Plaintiff amended its Complaint, and represent the State agencies of which Defendants are in charge.

found that *The Record* had the requisite interest in the payment notices. (*Id.* at 33–34.) Finally, Judge Moses held that the public interest in disclosing the payment notices outweighed any interest in confidentiality. (*Id.* at 34–48.) Judge Moses based her determination of the public interest in part on the New Jersey Legislature's passage of the NJHCCIA, which mandates that the payment notices be made public. (*Id.* at 47.) ("The Health Care Consumer Information Act sets forth the Legislature's current intent with respect to the confidentiality of medical malpractice payment records.")

On March 9, 2004, Judge Moses entered an Order granting access to the payment notices. (Kornett Decl., Ex. B.) Pursuant to the March 9th Order, State Defendants were ordered to send to all affected practitioners copies of the information contained in State Defendants' files regarding all medical malpractice payments made on the practitioner's behalf from March 15, 1999 through March 15, 2004, "for the purpose of permitting the practitioner to review the accuracy of the information therein." (*Id.*, Ex. B, ¶ 2.) The March 9th Order gave practitioners until May 10, 2004 to dispute any claimed inaccuracy in the records collected by State Defendants. Judge Moses ordered the release to *The Record* of all undisputed notices and those notices for which a dispute had been resolved by May 11, 2004. For those notices for which a dispute had yet to be resolved, Judge Moses ordered State Defendants to resolve any outstanding issues and release those notices to *The Record* by June 10, 2004. If the practitioner requested an extension to submit supporting information disputing the accuracy of the information in a disput-

ed notice, the deadline for State Defendants to release that notice was June 25, 2004.

MSNJ did not take part in the State court action.

## III. CURRENT ACTION

On May 6, 2004, three business days before Judge Moses' March 9th Order was to become effective, MSNJ filed the current action by way of order to show cause. Plaintiff's order to show cause sought a temporary restraining order and preliminary injunction enjoining Defendants from: (1) disclosing to *The Record,* pursuant to Judge Moses' Order, information contained in medical malpractice payment notices submitted to the State pursuant to N.J.S.A. § 17:30D–17; and (2) enforcing the NJHCCIA.[7]

Plaintiff's Complaint contains six counts. Count One alleges, pursuant to 42 U.S.C. § 1983, that Judge Moses' March 9th Order will deprive, under color of state law, MSNJ's members of a right to privacy secured to them under federal law, namely the HCQIA, and requests injunctive relief. Count Two claims, pursuant to 42 U.S.C. § 1983, that Judge Moses' March 9th Order will deprive, under color of state law, MSNJ's members of their rights under the Fifth and Fourteenth Amendments of the United States Constitution and requests injunctive relief. Count Three alleges, under 42 U.S.C. § 1983, that Judge Moses' March 9th Order will deprive, under color of state law, MSNJ's members of fundamental privacy rights secured to them by the United States Constitution and requests injunctive relief. Count Four alleges that the NJHCCIA violates Article I,

---

7. The Court notes at the outset the extremely tight time frame upon which Plaintiff forced this Court. The prior State court action before Judge Moses had been ongoing for months. MSNJ waited almost two months after Judge Moses issued her March 9th Order to bring the current action. Furthermore, the NJHCCIA was enacted almost 11 months before Plaintiff brought the current action.

Section 10, clause 1 of the United States Constitution, demands a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and requests injunctive relief. Count Five, also brought under 28 U.S.C. § 2201, alleges that the NJHCCIA violates the Fifth and Fourteenth Amendments of the United States Constitution, and demands a declaratory judgment as well as injunctive relief. Count Six prays for injunctive relief and demands a declaratory judgment under 28 U.S.C. § 2201 that the Department of Consumer Affairs did not properly enact regulations, pursuant to the New Jersey Administrative Procedures Act, pertaining to the NJHCCIA.

A telephone conference was held before this Court on May 7, 2004. During the conference, the Court posited the option of a stay, by consent, of Judge Moses' Order to allow this Court reasonable time to analyze the issues before it. At that time, *The Record* was not a party to the current action and had not been served with MSNJ's Complaint or supporting motion papers. The Court contacted counsel for *The Record,* Dina L. Sforza, Esq., and Ms. Sforza, on behalf of her client, consented to a temporary stay of Judge Moses' March 9th Order.

Thereafter, this Court ordered Defendants and *The Record* to file opposition papers by May 21, 2004 and MSNJ to file reply papers by May 28, 2004. The Court scheduled oral argument for June 7, 2004.

On May 21, 2004, *The Record* filed its opposition papers to Plaintiff's motion for a preliminary injunction and concurrently moved to intervene in this action, pursuant to Fed.R.Civ.P. 24(a)(2). The Court granted *The Record's* motion to intervene.

Along with its opposition to Plaintiff's motion, also filed May 21st, Defendants cross-moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) & (6).

MSNJ opposed Defendants' cross-motion in its reply papers filed on May 28th.

The Court heard argument on June 7, 2004 and issued an oral Opinion and a written Order summarizing the rulings made. The Court issued this Opinion thereafter.

## DISCUSSION

### I. JURISDICTION AND JUSTICIABILITY ISSUES

Before the Court addresses the merits of Plaintiff's claims, the Court must first determine whether it may even hear the case as presented.

### A. *Standing*

■ MSNJ alleges that, as an association, it has standing to bring this action on behalf of its members. In *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court outlined the standard for association standing.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. 2434. Typically, if the individuals that make up the body of an association cannot show cognizable harm, the association cannot have standing. In other words, if there is no individual standing there is no association standing.

As discussed, MSNJ brings the current action on various grounds, including alleged violations of federal rights pursuant to the HCQIA and alleged violations of constitutional principles such as a funda-

mental right to privacy, equal protection, and the right to form contracts under United States Constitution, Article I, Section 10, clause 1. It is this last ground, the Contract Clause, to which Defendants claim MSNJ does not have standing.

Citing *Hunt*, Defendants object to MSNJ's standing to raise claims based on allegations that contractual rights of individuals would be impaired by the disclosure of medical malpractice payment notices.[8] Defendants argue that MSNJ's claim does not satisfy *Hunt's* third factor for associational standing: that neither the claim asserted nor the relief requested must require the participation of individual members in the action. *See Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. Defendants allege that the individual members' presence in court is necessary because it would be pure speculation to attempt to analyze how individual members' rights would be affected by this action without having these individuals appear in court and without examining the terms of their individual settlement contracts.

This claim is without merit. MSNJ does not ask this Court to foresee with particularity how each individual settlement contract entered into by MSNJ members will be affected by the outcome of this action. MSNJ simply asserts is that it is standard procedure for medical malpractice settlement contracts to include confidentiality provisions, and that Judge Moses' Order and the NJHCCIA, once in effect, would void these contractual provisions.

It is safe to assume that every New Jersey physician who entered into a medical malpractice settlement agreement that includes a confidentiality provision has a real interest in an action bearing upon the effectiveness of that confidentiality provision. Therefore, the doctrine of associa-

tional standing provides MSNJ the right to seek injunctive relief in order to defend its members' interest, and there is no need to require every individual member to appear before this Court. *See Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in association to represent their members, the relief sought has been of this kind.").

The Court finds that MSNJ has standing to bring this action.

## B. *Eleventh Amendment and Abstention*

In its opposition brief and cross-motion to dismiss the Complaint, Defendants assert various rationales for this Court to decline to hear this case on jurisdictional grounds.

### 1. Eleventh Amendment

■ First, Defendants assert that this action should be dismissed because the Eleventh Amendment precludes federal jurisdiction over a state absent the state's consent to suit. *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). This immunity from suit extends to agencies or departments of the state as well. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

At oral argument, the initial question before the Court concerned MSNJ's fail-

---

**8.** In sum, MSNJ's claim is that the NJHCCIA will require the disclosure of information which, pursuant to existing settlement con-

tracts, is required to be maintained as confidential.

ure to name the individual State officers responsible for turning over the confidential information pursuant to Judge Moses' Order and for enforcing the NJHCCIA. MSNJ originally named the State of New Jersey, Division of Consumer Affairs and Medical Practitioner Review Panel as defendants in this action. Under well-established case law, a plaintiff may only avoid the Eleventh Amendment bar to suit by naming a state officer as a defendant instead of the state government itself. *Ex Parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that the Eleventh Amendment does not preclude suits against state officers for injunctive relief).

The Court addressed this issue at length during oral argument on June 7th. Upon consent of Defendants, the Court permitted Plaintiff to amend its Complaint to properly name Mary Lou Mottola, Executive Director of the Medical Practitioner Review Panel, and Reni Erdos, Director of the Division of Consumer Affairs, in their official capacities as Defendants. The defendants originally named by Plaintiff were thereafter deleted from the case caption.

With the Complaint properly amended to name State officials instead of the State itself, the Court may address Defendants' claim that Eleventh Amendment immunity precludes this action. MSNJ correctly states that its claim for injunctive relief against Defendants falls under *Ex Parte Young's* exception to the Eleventh Amendment. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). "In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland Inc. v. Pub. Serv. Comm'n of Ma-*

*ryland,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)). MSNJ alleges that the disclosure of confidential information with regard to medical malpractice payment notices would constitute a violation of federal law, namely the HCQIA, as well as a constitutional violation of its members' due process, privacy, equal protection and Contract Clause rights. These allegations meet *Verizon's* "straightforward inquiry" requirement.

*The Record* and Defendants suggest that MSNJ's claim does not satisfy *Ex Parte Young* because Judge Moses' Order of March 9, 2004 and the NJHCCIA are not inconsistent with the HCQIA and therefore no violation of federal law exists. However, even if this allegation is true, the "inquiry into whether suit lies under *Ex Parte Young* does not include an analysis of the merits of the claim." *Verizon,* 535 U.S. at 646, 122 S.Ct. 1753 (citation omitted)

Therefore, the *Ex Parte Young* exception to the Eleventh Amendment applies to this action, Defendants are not immune from this suit, and this Court is not precluded from hearing this action.

█ It should be noted, however, that an exception to the *Ex Parte Young* doctrine—and therefore an Eleventh Amendment bar to suit—does apply to certain aspects of Plaintiff's Complaint. In *Pennhurst State School & Hospital v. Halderman,* the Supreme Court held that the Eleventh Amendment bars federal courts from enjoining state officers from violating state laws. 465 U.S. at 121, 104 S.Ct. 900. The Supreme Court found: "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment....We now hold

that this principle applies as well to state law claims brought into federal court under pendent jurisdiction." *Id.*

Accordingly, while Plaintiff's federal claims against Defendants fall under *Ex Parte Young* and are therefore permissible, Plaintiff's State law claims against New Jersey officials are barred by the Eleventh Amendment and may not be entertained by this Court.

### 2. *Younger* abstention

■ Defendants also argue that this Court should abstain from hearing this action pursuant to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* outlines two primary reasons—equitable principles and federalism or comity—for federal courts to abstain from hearing a case when there are pending state proceedings. A federal court should abstain under this doctrine when: (1) there is an ongoing state proceeding which is judicial in nature; (2) the proceeding implicates important state interests; and (3) there will be an opportunity at some stage of the proceeding to raise constitutional challenges. *Middlesex Co. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431–432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

Defendants' argument fails on two grounds. First, the State proceeding is no longer ongoing. Judge Moses' March 9th Order signified the final action in the case and Defendants chose not to file to appeal.

Second, Defendants contend that *Younger* and its progeny do not require the state court action to be currently pending at the time the federal action is filed. Rather, it is sufficient that the federal plaintiff has had an adequate opportunity to resolve the federal issues in state court. *O'Neill v. City of Philadelphia,* 32 F.3d 785, 790–791 (3d Cir.1994). This argument also fails. MSNJ was not a party to the State action, therefore it had no opportunity to present its federal claims in State court. Defendants contend that MSNJ *should* have intervened in the State court action but points to no authority *requiring* MSNJ to intervene in order to protect its rights to bring the federal claims included in this action.

Therefore, this Court will not abstain, pursuant to *Younger,* from deciding the current action.

### 3. The *Rooker–Feldman* doctrine

Defendants further allege that Plaintiff's Complaint is barred by the *Rooker–Feldman* doctrine. Defendants overstate the scope of the *Rooker–Feldman* doctrine and employ a flawed analysis.

The *Rooker–Feldman* doctrine bars federal jurisdiction if the claim was "actually litigated" in state court or if the claim is "inextricably intertwined" with the state adjudication. *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411, 419 (3d Cir. 2003) (citation omitted). The Third Circuit has consistently held that for the *Rooker–Feldman* doctrine to bar a plaintiff from bringing an action in federal court, the plaintiff must have been a party to the state court proceeding or must have, at the very least, been in privity with a party to the state court action. *Nat'l Railroad Passenger Corp. v. Pennsylvania Public Utility Comm'n,* 342 F.3d 242, 257 (3d Cir.2003); *Exxon Mobil Corp. v. Saudi Basic Indus.,* 364 F.3d 102, 105 (3d Cir. 2004). In this case, MSNJ was neither a party, nor in privity with a party, to the action before Judge Moses and therefore cannot be barred by the *Rooker–Feldman* doctrine.

■ Defendants argue that the case at bar is "inextricably intertwined" with claims that were already litigated. To support their argument, Defendants cite a recent Third Circuit opinion. *See ITT Corp. v. Intelnet Int'l,* 366 F.3d 205, 211

(3d Cir.2004) ("State and federal claims are inextricably intertwined (1) when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or (2) when the federal court must [ ] take action that would render [the state court's judgment] ineffectual.") (internal quotation marks and citations omitted).

Defendants' reliance on *ITT Corp.* is misplaced. First, the plaintiff in *ITT Corp.* was a party to the state court proceeding. Second, this Court need not determine that Judge Moses' Order was erroneously entered to find for Plaintiff in this case. None of the constitutional claims presented in this action were before Judge Moses.

Accordingly, the Court finds that the *Rooker–Feldman* doctrine does not bar this action from proceeding.

## II. MOTION FOR PRELIMINARY INJUNCTION

### A. *Standard for preliminary injunction*

The standard for granting an application for a preliminary injunction is well established in this Circuit.

> [W]hen ruling on a motion for preliminary injunctive relief, a district court must be convinced that consideration of the four following factors favors the granting of preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*Shire U.S. Inc. v. Barr Laboratories, Inc.,* 329 F.3d 348, 352 (3d Cir.2003) (citations omitted). Whether or not a court should grant a preliminary injunction under the four factor test is committed to the sound discretion of the trial court. *Id.* at 352 (citing *Duraco Prods., Inc. v. Joy Plastic Enters.,* 40 F.3d 1431, 1438 (3d Cir.1994)). However, a court must always be mindful that an injunction is "an extraordinary remedy which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989) (citation omitted).

Unlike a motion to dismiss, in considering a motion for a temporary restraining order and preliminary injunction, the Court may considers affidavits in support of and in opposition to the application for injunctive relief. Fed. R. Civ P. 65(b).

### B. *Application for preliminary injunctive relief with respect to the New Jersey Health Care Consumer Information Act*

Plaintiff claims that the NJHCCIA is in direct violation of federal law, namely the HCQIA. Furthermore, Plaintiff alleges that the NJHCCIA violates constitutional principles as well. The Court rejects Plaintiff's challenges to the law on both grounds.

#### 1. The NJHCCIA does not violate federal law

Plaintiff claims that the NJHCCIA, in conjunction with the reporting requirements of N.J.S.A. § 17:30D–17, violates a federal right to privacy provided medical practitioners by the HCQIA. The crux of Plaintiff's argument is that confidentiality provisions contained in the HCQIA, 42 U.S.C. § 11137, preclude Defendants from releasing information about malpractice settlements under New Jersey Law.

Plaintiff assumes that since the information collected pursuant to both statutory frameworks is the same, the federal privacy provisions trump State privacy provi-

sions. This is not the case. There is no provision in the HCQIA that makes information *independently* collected by a state agency confidential. Both federal law and New Jersey law require insurance companies to report information concerning malpractice payments. 42 U.S.C. § 11134(c) ("Information required to be reported under [the HCQIA] shall all be reported to the appropriate State licensing board (or boards) in the State in which the medical malpractice claim arose"); N.J.S.A. § 17:30D-17 (Insurers "shall notify the Medical Practitioner Review Panel ... in writing of any medical malpractice claim settlement, judgment or arbitration award involving any practitioner licensed by the State Board of Medical Examiners"). Therefore, the obligation on an insurance carrier to report information to the Panel is imposed as a dual requirement of both State and federal law. The information at issue is reported directly to the Panel by insurance carriers to comply with both federal and State law and is not information that the Panel obtains from the Data Bank itself. Accordingly, the confidentiality provisions in the HCQIA have no applicability to the information reported to the Panel, given that the information at issue is received directly by the Panel from insurance companies and not through the Data Bank.

This Court need not consider the privacy protections afforded by the HCQIA with regards to information sent directly to the Panel. Again, upon a clear reading of the HCQIA, there is simply no provision in the federal law deeming information that is independently collected by a state agency confidential. Without a consideration of the HCQIA, what remains is purely a question of New Jersey law.

Furthermore, Section 11137(b)(1) of the HCQIA provides a specific carve out for state law: "Nothing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclosure." 42 U.S.C. § 11137(b)(1). Once the NJHCCIA becomes effective, it is clear that New Jersey law will not preclude the public dissemination of medical malpractice information, specifically that information setting forth the dates on which malpractice payments were made by a practitioner and the amount of those payments.

Plaintiff agrees that once the NJHCCIA goes into effect, malpractice settlements will no longer be confidential under New Jersey law and will fall under the carve out provision in Section 11137(b)(1). (Pl. Reply Br. at 17.) However, MSNJ points to two sections of the New Jersey code that currently place restrictions on the dissemination of medical malpractice information, N.J.S.A. §§ 45:9-19.3 & 45:9-19.10(c). As discussed above, once the NJHCCIA becomes effective, these two sections will not apply to information contained in the published practitioner profiles. However, Plaintiff argues that the operation of these two privacy provisions currently, and for years past, cuts against the retroactive nature of the NJHCCIA, which requires disclosure of malpractice information from the past five years. MSNJ asserts that medical professionals have had an expectation of privacy during this five year period and many have entered into settlement agreements only because of the confidentiality clauses contained therein. (*E.g.*, G.F., M.D.Decl.¶ 3.) Plaintiff contends that the confidentiality clauses contained in settlement agreements have been effectively protected by N.J.S.A. §§ 45:9-19.3 & 45:9-19.10(c).

This argument presents an issue of New Jersey law that this Court may not consider. By objecting to the retroactive nature of the NJHCCIA, Plaintiff shifts from arguing that the information is protected

under the HCQIA to claiming that the five year disclosure requirement under the NJHCCIA is inappropriate given that N.J.S.A. §§ 45:9–19.3 & 45:9–19.10(c) protected the information during that five year period. Given this Court's finding that the information in question is collected pursuant to State law and not pursuant to the HCQIA, Plaintiff's argument that the retroactive nature of the NJHCCIA violates doctors' expectation of privacy is really a question of State law. As stated above, the Eleventh Amendment bars federal courts from enjoining state officers from violating state laws. *Pennhurst,* 465 U.S. at 121, 104 S.Ct. 900. Therefore, this Court may not entertain questions purely of State law.[9]

### 2. The NJHCCIA is not unconstitutional

Plaintiff also alleges that the NJHCCIA violates various provisions of the United States Constitution. First, Plaintiff claims that the NJHCCIA violates the Contract Clause of the Constitution. U.S. CONST., Art. I, § 10, cl. 1. Plaintiff further claims that the NJHCCIA violates MSNJ members' fundamental right to privacy. Finally, Plaintiff claims that the NJHCCIA violates equal protection principles.

### a. Contract Clause claim

■ Plaintiff's main argument with respect to the NJHCCIA is that it is unconstitutional because it violates Article I, Section 10, clause 1 of the United States Constitution by requiring the disclosure of information subject to confidentiality agreements in existing contracts. This claim is wrong for multiple reasons.

First, New Jersey law provides that information about any malpractice judgment, award or settlement must be disclosed to the State Board of Medical Examiners. N.J.S.A § 17:30D–17. Section 17:30D–17 specifically provides that settlements that preclude the disclosure of such information to the Board are void and unenforceable. Thus, the confidentiality requirement in existing medical malpractice settlements may bind the parties to the agreement, however, it certainly does not bind the State Board of Medical Examiners. Because the NJHCCIA seeks to disclose information legally obtained by the Panel, it cannot be viewed as "impairing the Obligation of Contracts." U.S. CONST., Art. I, § 10, cl. 1.

Second, the magnitude of the NJHCCIA's impairment effect on medical malpractice agreements does not meet the constitutional threshold as provided by existing case law. In *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Supreme Court enunciated a three-part test to determine whether a state's exercise of its police power violates the impairment of contracts clause in the Constitution. "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Id.* at 411, 103 S.Ct. 697 (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)). If this threshold is met and "the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a

---

9. Similarly, in Count Six of the Complaint, Plaintiff alleges that the Department of Consumer Affairs did not properly enact regulations, pursuant to the New Jersey Administrative Procedures Act, pertaining to the NJHCCIA. The Court need not consider this question. Count Six alleges nothing more than a violation of State law, and this Court is precluded from considering the arguments presented by Plaintiff. *See Pennhurst,* 465 U.S. at 121, 104 S.Ct. 900.

broad and general social or economic problem." *Id.* at 411, 412, 103 S.Ct. 697 (citations omitted). If the court finds that a legitimate public purpose exists, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Id.* at 412, 103 S.Ct. 697 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)).

Plaintiff fails to meet the first factor of the *Energy Reserves* test. The primary purpose of medical malpractice settlements is to resolve disputes between the parties. Confidentiality is only a collateral aspect of the settlement. Plaintiff failed to show how this collateral aspect is a fundamental and necessary part of medical malpractice settlements.

Finally, even if the NJHCCIA did cause a substantial impairment to existing contracts, this disservice does not amount to a violation of the Contract Clause because the State has "a significant and legitimate public purpose" behind the legislation. *Id.* at 411–412, 103 S.Ct. 697. It is clear that providing consumers with relevant information about physicians' backgrounds helps consumers to make informed choices with regard to medical services. Because the NJHCCIA is grounded in a legitimate public purpose and the State is not a party to the medical malpractice agreements, this Court must respect the New Jersey Legislature's policy-making authority with

regards to the necessity and the reasonableness behind disclosure of statutorily mandated medical malpractice information.[10]

Accordingly, Plaintiff's constitutional claim for violation of the Contract Clause fails.

### b. Right to privacy

■ Citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), MSNJ claims that enforcement of the NJHCCIA and Judge Moses' Order would amount to a constitutional infringement on the fundamental privacy rights of New Jersey's physicians. Plaintiff does not demonstrate how *Roe* is applicable to this claim. *Roe* held that the Constitution protects certain "fundamental privacy rights" from governmental acts. *Roe* described these fundamental privacy rights as rights "implicit in the concept of ordered liberty." *Id.* at 153, 93 S.Ct. 705. The Supreme Court found that these rights "ha[ve] some extension to activities relating to marriage ... procreation, contraception ... family relationships ... child rearing and education." *Id.* (citation omitted). Plaintiff makes no showing that the right to privacy alleged here amounts to a fundamental privacy right. In addition, Plaintiff admitted at oral argument on June 7, 2004 that it had, in effect, abandoned this claim.

Accordingly, Plaintiff's claim that the NJHCCIA violates medical practitioners' fundamental right to privacy must fail.

---

**10.** Upon approving the NJHCCIA, Governor James E. McGreevey stated:

> This bill will assist health care consumers in making informed choices about their physicians and podiatrists by being able to evaluate their education, experience, criminal and disciplinary background, and information with respect to medical malpractice court judgments, arbitration awards and settlements made to a complaining party in

the last five years. The information will be available on line as well as through a toll free telephone number established by the Division of Consumer Affairs which will be available to the public.

*Senate Committee Substitute for Senate Bill No. 571,* dated January 27, 2003, available at *http:// www.njleg.state.nj.us/2002/Bills/S1000/571– V1.htm.*

### c. Equal protection

MSNJ further claims that the NJHCCIA improperly distinguishes between physicians and podiatrists on the one hand, and other types professionals on the other hand. It further argues that the State has no compelling reason to require the disclosure of information concerning settlements of cases involving doctors, while permitting settlements involving other professionals to remain confidential. MSNJ does not provide any support for this claim, and the briefs submitted by Defendants and *The Record* do not address this issue.

The Third Circuit held that in order to state an equal protection claim, a claimant must show that others similarly situated have not been treated in the same manner, and that the State's decisions were made pursuant to "an unjustifiable standard . . .'such as race, religion, or other arbitrary classification'. . . or to prevent [the plaintiff's] exercise of a fundamental right." *Gov't of the Virgin Islands v. Harrigan,* 791 F.2d 34, 36 (3d Cir.1986) (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)(other citations omitted)). New Jersey's physicians do not fall under any of the categories enumerated in *Oyler.*

Given that the constituents represented by MSNJ do not fall into one of these specifically delineated groups, MSNJ's equal protection argument must fail.

### 3. No preliminary injunction

■ Because Plaintiff fails to assert a cognizable claim that the NJHCCIA violates federal law, Plaintiff does not meet the first requirement of the preliminary injunction standard. *See Shire US,* 329 F.3d at 352 (holding that a party moving for injunctive relief must first show a likelihood of success on the merits).

In addition, the extent to which the non-moving party will suffer irreparable harm if the injunction is issued outweighs the extent to which the moving party will suffer irreparable harm without injunctive relief. *Id.* Plaintiff cannot be heard to complain of disclosure of judgments since, by their very nature, judgments are public records. Any claim to irreparable injury with respect to the release of malpractice settlement information pursuant to the NJHCCIA is attenuated by the following statement in each physician's profile:

> "Settlement of a claim and, in particular, the dollar amount of the settlement may occur for a variety of reasons, which do not necessarily reflect negatively on the professional competence or conduct of the physician (or podiatrist). A payment in settlement of a medical malpractice action or claim should not be construed as creating a presumption that medical malpractice has occurred."

N.J.S.A. § 45:9–22.23(a)(10)(d).

Moreover, the non-moving party would suffer irreparable harm if this Court were to grant the injunction. The State's interest in protecting consumers of medical services could be impaired by a patient choosing a doctor whose performance has been serious compromised. The public would be deprived of information that could be vital in making an informed decision in one of the most important areas of life: one's health.

Finally, public policy weighs in favor of the NJHCCIA. *Id.* (holding the fourth factor in the preliminary injunction analysis consists of the court weighing public policy considerations). Federal courts must give deference to laws passed by the state legislature. *O'Neill,* 32 F.3d at 790–91.

For the foregoing reasons, Plaintiff's motion to enjoin the enforcement of the NJHCCIA is DENIED.

### C. *Application for preliminary injunctive relief with respect to Judge Moses' March 9th Order*

#### 1. Violation of due process

 MSNJ contends that Judge Moses' March 9th Order should not be enforced against it because MSNJ was not a party to the State action. Plaintiff claims that its members cannot be bound by a State court order when they were not a party to the case.

In support of its position, MSNJ provides two anonymous declarations of doctors who entered into malpractice settlement agreements. One doctor declared that he settled a particular suit for a sum of $35,000 rather that go through the time and expense of trial. (G.F., M.D.Decl.¶3.) The doctor stated that he would not have settled the case but for the clause requiring the parties to keep confidential the settlement and its terms, including the amount paid. The doctor declared that he only recently became aware of the action before Judge Moses. (*Id.* ¶ 4) ("I was given no notice of this lawsuit and no opportunity to participate in any way. I was greatly distressed to learn that a judge of the Superior Court decided to, in effect, remove the confidentiality clause which had been an important part of my agreement to settle the case.") An anonymous declaration from a second doctor contained similar statements. (R.H., M.D.Decl.¶5.)

Although the Court is sympathetic to the doctors' plight, Plaintiff's arguments do not rest on a sound statement of the law. MSNJ alleges that because it was not a party to the State court action, Judge Moses' Order violates the due process rights of its members. Plaintiff cites no authority for this claim. Plaintiff was aware of the State litigation that lasted for more than five months, yet made no attempt to intervene in that action, or to challenge its outcome—or the constitution-

ality of the NJHCCIA on which the judgment partially relied—in State court. Further, Judge Moses found that *The Record's* request was limited to information held by the State, and that this information, under the common law, is a public record. *The Record* did not seek the disclosure of any information solely under the control of MSNJ, New Jersey's physicians, or any other non-governmental party. There is no due process violation because Judge Moses ordered the release of information that the Panel collects, not a release of information from the doctors themselves. Thus, *The Record* had no reason, and was under no obligation, to join MSNJ in the State action.

In addition, by refuting Defendants' arguments regarding *Younger* abstention and the *Rooker–Feldman* doctrine, discussed above, MSNJ emphasized that it was not bound to intervene in the action before Judge Moses. Plaintiff cannot on the one hand claim it was not forced to intervene and on the other hand claim the rights of its members were violated because it did not choose to intervene.

#### 2. Information at issue in the March 9th Order is not confidential pursuant to the HCQIA.

 Plaintiff contends that the information *The Record* sought released in the State court action is information gathered and maintained by the federal government pursuant to the HCQIA and is therefore subject to the confidentiality protections outlined in the HCQIA. However, in truth, *The Record* sought disclosure of malpractice payment notices required to be provided by insurers to the Panel pursuant to N.J.S.A. § 17:30D–17.

As discussed above, while the HCQIA and Section 17:30D–17 require disclosure of the same type of information, the two

statutory obligations are separate and distinct.

Moreover, in granting *The Record's* application for access to the documents, Judge Moses held that the payment notices constituted common law public records. Judge Moses made this finding based on the fact that insurers are required to submit the notices to the Panel pursuant to New Jersey statute, N.J.S.A. § 17:30D–17.

Judge Moses based her decision on a sound interpretation of New Jersey common law principles. Therefore, even if this Court were to look to the plain language of the HCQIA, which it does not need to do given that the information in question is reported directly to the Panel, it is clear that the HCQIA does not apply. The confidentiality provision of the HCQIA states that "[n]othing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, *under applicable State law*, to make such disclosure." 42 U.S.C. § 11137(b)(1)(emphasis added). Here, Judge Moses has made the determination that the information may be disclosed under applicable New Jersey common law. Therefore, even pursuant to the framework of the HCQIA, the information ordered released to *The Record* by Judge Moses clearly falls under the carve out provision of Section 11137(b)(1).

#### 3. No preliminary injunction

MSNJ has failed to satisfy the first factor required for a preliminary injunction: Plaintiff has not shown a likelihood of success on the merits. *See Shire US*, 329 F.3d at 352. In addition, the other factors required for a preliminary injunction, as previously discussed, weigh in favor of Defendants' compliance with the Order of the Superior Court. Because there is no federal statutory or constitutional impediment to releasing the information at issue pursuant to Judge Moses' March 9th Order, Plaintiff's motion for an injunction is **DENIED**.

### II. MOTION TO DISMISS

Defendants cross-move to dismiss MSNJ's Complaint pursuant to Fed. R.Civ.P. 12(b)(1) & (6).

#### A. *Fed.R.Civ.P. 12(b)(1)*

Defendants move to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction. To support their contention, Defendants allege: (1) this action is barred by the Eleventh Amendment; (2) the Court should abstain from hearing the case pursuant to *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 (1971); (3) the action is barred by the *Rooker–Feldman* doctrine; and (4) MSNJ does not have standing to bring this action.

All four of these claims were discussed above, and the Court found all four to be without merit. Accordingly, Defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is **DENIED**.

#### B. *Fed.R.Civ.P. 12(b)(6)*

A court may grant a motion to dismiss for failure to state a claim only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the plaintiff is entitled to no relief. *See Doe v. Delie*, 257 F.3d 309, 313 (3d Cir.2001) (citations omitted). Accordingly, this Court may grant Defendants' motion to dismiss the Complaint only if it appears that Plaintiff can prove no set of facts in support of its claims that would entitle MSNJ to relief. *Id.; Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering Defendants' Rule 12(b)(6) motion, the Court limited its examination to only the pleadings. *See* Fed.R.Civ.P.

12(b)(6) (excluding matters outside the pleadings on a motion to dismiss for failure to state a claim upon which relief can be granted).

Viewing Plaintiff's claims in the most favorable light, Plaintiff, as previously discussed, is not entitled to any federal or statutory relief. The balance of the relief sought presents solely a question of State law. Therefore, Plaintiff's Complaint must be dismissed for failure to state a claim.

Moreover, Defendants raise an additional question as to Plaintiff's ability to bring Count One of the Complaint, in which Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that Judge Moses' March 9th Order will deprive, under color of state law, MSNJ's members of a right to privacy secured to them by the HCQIA. (Compl.¶ 30.) The Complaint also alleges that MSNJ's members would suffer immediate, irreparable harm by reason of a breach of their reasonable expectation of privacy and requests injunctive relief. (*Id.* ¶ 30–31.)

Plaintiff may only maintain a Section 1983 action where the rights sought to be vindicated are unambiguously conferred. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 291, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("The ultimate question, in respect to whether private individuals may bring a lawsuit to enforce a federal statute, through 42 U.S.C § 1983 or otherwise, is a question of congressional intent") (Breyer, J., concurring); *see also Sabree ex rel. Sabree v. Richman,* 367 F.3d 180, 189–190 (3d Cir.2004).

Plaintiff fails to demonstrate that Congress intended the HCQIA to provide private individuals with the right to bring § 1983 actions. Upon a plain reading, the language of the statute does not provide such a right. *See Bonneville Intern. Corp. v. Peters,* 347 F.3d 485, 491 (3d Cir.2003) (holding that when a court interprets a statute, it must first look to the plain meaning of the text) (citation omitted). Furthermore, there is no case law that this Court has found interpreting the HCQIA to provide such right. Finally, since MSNJ fails to demonstrate that Judge Moses' Order would violate unambiguous constitutional or federal rights of its members, Section 1983 cannot apply to this case.

Accordingly, for the reasons stated above, Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is **GRANTED**.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for preliminary injunctive relief is **denied**. Defendants' motion to dismiss for lack of subject matter jurisdiction is **denied**. Defendants' motion to dismiss for failure to state a claim is **granted**. Plaintiff's Complaint is dismissed in full.

An appropriate Order encapsulating rulings made both in this Opinion and during oral argument was issued on June 7th, 2004.